[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 497 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 498 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 499 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 500 
I have not considered it necessary to determine the disputed question of fact, whether Hawley paid value for the bond and mortgage which Steele and Poole *Page 501 
executed to him and which is sought to be foreclosed in this case. Assuming that the loan was in fact made by the American Life Insurance and Trust Company directly to the mortgagors, and that the securities were taken in the form in which they appear with their assent, for the purpose of securing that loan, there is nothing in the want of consideration between them and Hawley which will affect their validity. If the other defences are not sustained, the bond and mortgage became a valid security in the hands of the corporation; and Hawley, by his guaranty, assumed the position of a surety for the borrowers.
The first question to be considered, therefore, is, whether the act incorporating the trust company prohibited it from taking a greater interest upon loans than at the rate of six per cent per annum. Although the principle is well settled that the validity of a contract, in respect to the laws concerning usury, depends upon the institutions of the country in which the contract is made, especially when, as in this case, it is to be performed within the same jurisdiction, yet, as this loan was made by a corporation, not having all the capacity of a natural person, but being limited in its faculties for the transaction of business by its act of incorporation, if it be found that the contract was one which it was forbidden by that act to make, the loan and all the securities taken to enforce its reimbursement are necessarily void. (Bank of the U.S. v. Owens, 2 Pet., 527; Bank ofAugusta v. Earl, 13 id., 587; Beach v. The Fulton Bank,
3 Wend., 582; Life and Fire Ins. Co. v. Mechanics' Fire Ins.Co., 7 id., 31; Talmage v. Pell, 3 Seld., 328.) The defendants' counsel maintains that the effect of the proviso in the fourth section of the charter of the company forbids its taking more than at the rate of six per cent interest upon its loans; that the reference to "the existing laws," by which laws the exacting of a greater amount of interest is declared to be usurious, limits the rate which the company may receive to that amount, and that it is the same in substance *Page 502 
as though the statute had provided in terms that the company should make no contract reserving a higher rate of interest than six per cent. That the laws referred to as existing laws mean the laws of Maryland, there can be no doubt; but it is by no means certain that the reference is to the law on the subject of interest which was in existence at the time the act was passed. Had that been the intention, it seems probable that it would have been more strongly expressed, that the company should be limited to six per cent. We must suppose that the legal rate of interest was well known to the legislature; and if they had designed to prescribe that rate for the company absolutely, it would probably have been so stated in direct language. The charter of the Bank of the United States, affords an example of the natural form of expression adopted to convey such an intention: "The bank shall not be at liberty to take more than at the rate of six percentum per annum for or upon its loans or discounts." (3Story's Laws, 1554 — 9th fundamental article.) I am of opinion that the reference is to such laws as should exist in Maryland on the subject of interest at the making of the contract; and thus understood, the proviso is an injunction that the company should not, in its transactions, take a greater rate of interest than that which should be allowed by the laws of the state for the time being. If this is the true construction, the object of the proviso was to oblige the company to conform to the general laws by which natural persons should be governed, in respect to the rate of interest to be reserved upon its contracts. But natural persons who are citizens of Maryland may lend money or make any other contract in another state or country, and reserve or take such rate of interest as is allowed by the state or country in which the contract is made. This results from the principle already stated that the lex locicontractus furnishes the rule by which the validity of the contract is to be determined; and the doctrine is well settled. (Story's Conf. of Laws, § 291, 292; Chapman *Page 503 
v. Robbins, 6 Paige, 627; Gibbs v. Fremont, 9 Welsby,Hurlstone Gordon, 25.) It is unnecessary to notice the distinctions which have been made where a contract has been entered into in one country to be performed in another, or where a bill of exchange has been drawn at one place and endorsed in another jurisdiction; for the contract in this case was to be performed in this state, in which it was made. Having ascertained that the charter of this company bound it to observe the rules respecting interest which should be prescribed from time to time for the government of the citizens of the state who were natural persons, in respect to contracts to be made within the state, there is no reason to suppose that it was intended to place it upon a different footing from individuals in respect to extra-territorial contracts. There is nothing on the face of the enactment to lead to such an inference. Indeed, the language, literally construed, will not admit of that construction. The corporation is not allowed to make any contracts "which by the existing laws amount to usury." Now this contract would not be usurious in Maryland if it had been made in New-York by a natural person living in Maryland; and upon the supposition that the courts of that state would adhere to the doctrine of the lexloci, of which I have no doubt, such a contract would be readily enforced there notwithstanding the rate of interest is greater than that allowed by its laws, whether the parties were citizens of that or of any other state. It may be said that the general law of Maryland having fixed the rate of interest, this corporation would have been governed by that law if no special provision had been inserted in the charter, and that therefore the proviso in question should receive a different and more extended construction. But a reference to a portion of the section which precedes this clause will reflect some light upon this argument. The company was authorized to make "all kinds of contracts in which the casualties of life and interest of money
are involved." Though this language *Page 504 
is very broad, perhaps it would not admit of a construction which would enable the company to disregard the usury laws; but it certainly presented a case in which ordinary caution would dictate that its generality should be restrained by such a limitation as is contained in the proviso. The sense of the whole, I think, is that although the company is permitted to make all kinds of contracts in which the interest of money is involved, yet this is not to be understood as allowing it to violate the laws of the state against usury. This view is strengthened by the prohibition in the same proviso against printing and putting in circulation notes in the nature of bank-notes. There is nothing in what goes before which necessarily confers banking powers; yet from abundant caution it was thought necessary expressly to forbid the corporation from acting as a bank of issue. These considerations have convinced me that the proviso has nothing to do with this contract made in the State of New-York, and securing only the rate of interest which our laws allow.
We are next to inquire whether the contract is illegal in consequence of the establishment by the company of the office in the city of New-York, and of the transaction of the description of business which it carried on there, and the connection of the loan in controversy with that office. In respect to contracts made in another state, a corporation stands upon a different footing in some respects from individuals. As to the latter, the citizens of each state are entitled to all privileges and immunities of citizens of the several states. This is secured by the national constitution. But corporations are not citizens in the sense of that provision. They are beings existing only in contemplation of law, and have no other attributes than such as the law confers upon them; and as the laws of a country have in general no extra-territorial operation, a corporation cannot challenge, as a matter of right, the privilege of dealing in a country not under the jurisdiction of the sovereignty which *Page 505 
created it. Any of the states of the Union may, as this and several of the other states have done, interdict foreign corporations from performing certain single acts, or conducting a particular description of business within its jurisdiction. But in the absence of laws of that character, or in regard to transactions not within the purview of any prohibitory law, and not inconsistent with the policy of the state as indicated by the general scope of its laws or institutions, corporations are permitted by the comity of nations to make contracts and transact business in other states than those by virtue of whose laws they were created, and to enforce those contracts, if need be, in the courts of such other states. It is, of course, implied that the contract must be one which the foreign corporation is permitted by its charter to make; and it must also be one which would be valid if made at the same place by a natural person, not a resident of that state. (Silver Lake Bank v. North, 4 Johns.Ch. R., 370; Bank of Augusta v. Earle, 13 Pet., 519;Mumford v. Am. Life Ins. Trust Co., 4 Comst., 463.) The power to make loans of money on the security of mortgages on real estate was among the express powers of the American Life Insurance and Trust Company; and there is nothing in the laws of this state prohibiting a foreign corporation or other non-resident from making such loans within the state. Loans of that kind are not forbidden by any of the acts respecting unauthorized banking. If, then, this bond and mortgage are invalid it must be solely on account of their connection with the agency which the company established in the city of New-York. The evidence certainly tends to show, if it does not conclusively establish, that the business of banking in some of its branches was carried on by this corporation, through that agency, in violation of the laws against unauthorized banking. (1 R.S.,
712, §§ 3, 5, 6.) It is also shown that the officers of the company, in charge of that agency, were its agents in making the loan in controversy. It is not, however, established *Page 506 
that the loan had any other connection with the business carried on at the office in New-York. It does not appear that the business of receiving deposits, dealing in exchange or loaning upon bills and notes, or putting in circulation the bonds of the company, was in any manner aided by the making of this loan; and there is nothing in its nature which would lead to the belief that it was auxiliary to that business. Assuming then that the company, by means of its New-York agency, was conducting a banking business in that city, in contravention of our laws, it does not follow that a transaction, otherwise legal, would be contaminated by being conducted by the same agents and at the same office. The fact that they were carrying on an illegal business, supposing the charge to be established, did not render them incapable of promoting a legal one. Again, the law prescribes the consequences to be visited upon illegal banking. The offenders are subjected to a heavy fine, and all the contracts and securities taken in the course of such business are void. Policy does not require, and the law does not enjoin, that in addition to this, their legal acts shall also be avoided as a punishment for being at the same time engaged in illegal ones. InDe Groot v. Van Duzer (20 Wend., 390), which arose upon demurrer, the pleas alleged that the contract, which was the subject of the action, was entered into to aid the foreign banking company in carrying on its business in New-York; but, as before remarked, such an averment in the present case would not be sustained by the proofs. I am therefore of opinion that there is nothing in the fact, that the loan was applied for at the office in New-York, and that the negotiation was conducted and the business consummated on the part of the company by the officers who carried on the business in that city, to make the transaction illegal.
The fact that a larger proportion of the whole business of the company was transacted at the New-York agency than at the principal office in Baltimore, and that a majority *Page 507 
of the trustees resided in New-York, affords an additional reason for concluding that the office in that city was illegal. Still this bond and mortgage had no necessary connection with that circumstance. The loan being itself perfectly legal, and one which the company could have made if they had not established an office in New-York, it is not perceived how it can be vitiated by the existence of that office. If it was a necessary and inevitable result of the agency, and could have had no existence, except in connection with it, there would be force in the argument that it was parcel of an illegal transaction; for I concede that it would be a violation of our sovereignty for a foreign corporation to remove from the country or state where it was created to locate itself wholly in this state; but such was not the case. The money advanced to the mortgagors is presumed to have belonged, beneficially, to the stockholders of the company, and it has been shown that it could be lawfully loaned on mortgage by the company in New-York. Then the form and substance of the securities taken are entirely unobjectionable. In such a case I cannot suppose that the fault of the officers in undertaking to remove the seat of the corporation to New-York, if it were shown that they had done so, ought to operate to forfeit this money to the borrowers.
Having come to the conclusion that the defence on the merits has failed, I should be glad to find that the proper proceedings have been taken so that the controversy might now be finally determined. But I do no see how the objection of the want of proper parties can be answered. The bond and mortgage were placed by the company in the hands of the complainants and another person, since deceased, as security for a large debt owing to Messrs. Morrison, and for future advances to be made by them. Afterwards the company executed a general assignment to Macauley and others, in which the hypothecation to the complainants was ratified; but the company's interest in the securities, subject to the rights of Morrison Co., passed *Page 508 
to their assignees. Subsequently to both these transactions the company made a second assignment under the corporate seal to the complainants. This last document did not affect the rights of the trustees under the general assignment, for it is shown that the general debts are not paid. The effect of the several transactions is that the complainants, as the trustees of Morrison Co., hold an interest in the nature of a mortgage of the securities; and the trustees, under the general assignment, have a right to redeem them by paying the debt to Morrison Co., for the security of which the complainants hold them. In such cases it has uniformly been held that the persons, having a right to redeem the mortgage sought to be foreclosed, must be parties to a bill of foreclosure. The point was decided by the court of errors as early as Johnson v. Hart (3 Johns. Cas., 322). The reason of the rule is that possibly the general assignees, in whom the legal title of the securities is, might be able to show that the debt for which they were mortgaged to the complainants or to Morrison Co., whom they represent, has been paid; and they are entitled to be brought before the court to enable them to do so. The principle of Johnson v. Hart is recognized inWhitney v. McKinney (7 Johns. Ch. R., 144), and I do not find that it has ever been questioned. The proper order to have been made in the court below was to allow the complainants to amend, so as to bring the necessary parties before the court, and to direct the cause to stand over to afford an opportunity for this to be done. As the objection was specifically taken in the answer, the complainants should have been charged with the costs of the hearing before the vice-chancellor, and of the appeal to and hearing before the supreme court; except as to Steele and wife, who were informed that no personal claim was made on them. The decree appealed from must be reversed with a direction to the supreme court to make such an order as has been mentioned. (VanEpps v. Van *Page 509 Dusen, 4 Paige, 64; 1 Barb. Ch. Pr., 321.) Neither party will recover costs against the other in this court.
CRIPPEN, J., delivered an opinion to the same effect.
All the judges concurred in the foregoing opinion delivered by DENIO, J.
Judgment accordingly.